IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA


MATTHEW DON WATERDOWN and      )
SHIRLEY WATERDOWN, individuall )
and as next best friends of    )
M.C. WATERDOWN,                )
                               )
            Plaintiffs,        )
                               )
      -vs-                     )Case No. 20-CV-285-GKF-JFJ
                               )
DAGOBERTO CHAVEZ and MTV       )
SERVICES, LLC, et al,          )
                               )
            Defendants.        )


DEPOSITION OF *DAVID DANAHER*, taken on behalf of the plaintiffs pursuant to the following stipulations, on the 18th day of February, 2022, via Zoom, before Kellie Erwin, Certified Shorthand Reporter in and for the State of Oklahoma.



*   *   *   *   *   *   *   *


*ERWIN REPORTING*
6122 SOUTH ZUNIS AVENUE
TULSA, OKLAHOMA 74136
(918)231-2533

Exhibit 2

<u>A P P E A R A N C E S</u>

FOR THE PLAINTIFFS:            MR. D. MITCHELL GARRETT, JR.
                               Garrett Law Center
                               320 South Boston Avenue
                               Suite 825
                               Tulsa, Oklahoma 74103
                                     -and-
                               MS. JACLYNN LONEY
                               The Loney Law Firm
                               1216 East Kenosha
                               Suite 140
                               Broken Arrow, Oklahoma 74012

FOR THE DEFENDANTS:            MR. JASON GOODNIGHT
                               Franden, Farris, Quillin,
                                Goodnight, Roberts & Ward
                               Two West Second Street
                               Suite 900
                               Tulsa, Oklahoma 74103



            *   *   *   *   *   *   *   *


<u>S T I P U L A T I O N S</u>


        It is hereby stipulated and agreed by and

between the parties hereto, that this deposition is

being taken pursuant to notice and agreement and that

the same may be taken at this time and place.

        It is further stipulated and agreed that all

objections are reserved to the time of trial, except as

to form, with the same force and effect as if made at

the taking of the deposition.

```
 1          to scroll.
 2   A.     Perfect.
 3               Okay.  Keep going down.
 4               Keep going down.
 5               Keep going down.
 6               Yeah, I think the rest of these -- no, these
 7          won't have that in them, so I think that's all.
 8   Q.     Okay.  What about some of these invited lectures?
 9   A.     So the Low Speed Override of Passenger Vehicles
10          with Heavy Trucks; that one.  So 2 and 3.
11               Scroll down.
12   Q.     Goes back before the COVID when we all used to
13          actually go to conferences.
14   A.     I know; right.  Crazy how things have changed.
15               Keep going down.
16               Just that one.
17   Q.     Okay.  So then, let's talk about the funded and
18          supported research, any of those?
19   A.     No, none of the rest of those.
20   Q.     And any of your media appearances?
21   A.     No.
22   Q.     So have we talked about, to the best of your
23          knowledge, on your CV here some of the places where
24          you had some specific academic either training,
25          input or presentation involving underride-type
```

```
 1        Plaintiff's expert and the depositions of the
 2        Waterdowns, would you have any changes to your
 3        Conclusions or your Closing?
 4   A.   It would only be in response to Mr. Harrison's
 5        report.
 6   Q.   Okay.  And we're going to go into that here in a
 7        minute.  Just in a high level, would you change
 8        anything in your report?
 9   A.   No.
10   Q.   So as we sit here today, you're not aware of any
11        inaccuracies in your report?
12   A.   Actually go back real quick to the Conclusions; I
13        just noticed something.
14            Stop at the Conclusions.
15            Actually, yeah, there is an error.  The time,
16        I don't know why it says that because it's not what
17        the rest of the body says.  So the one that says
18        "At the time" -- so, like, one, two, three, four,
19        five -- six down it starts with "At," yeah, that
20        7 seconds should be 5.5.  The body of the report,
21        it's all 5.5; I don't know why that says 7.
22   Q.   So at trial you would testify to 5.5 like it is
23        stated in the body, not 7?
24   A.   Yeah.  That's a typo.
25   Q.   Okay.  Any other inaccuracies you're aware of in
```

1  Q.  And that kind of gets into these last two lines of
2      your Conclusions.  You're talking about
3      Mr. Waterdown's reaction time and, you know, by
4      looking at the driver's manual, braking time; is
5      that correct?
6  A.  Yes.
7  Q.  Okay.  So would you say that looking at, like --
8      let's just pick one out of here.  The driver's
9      manual where it talks about a braking time, would
10     you say that those are dependable objective
11     findings?
12 A.  I don't know how to answer that.  I mean, that's
13     what the Oklahoma Driver's Manual states are these
14     distances; how they determine them, I don't know.
15     It's what they related.  I look at the book --
16 Q.  Yeah, let's pull that up real quick so we're not
17     talking in a vacuum.
18 A.  Sure.
19 Q.  This is Exhibit -- Plaintiff's Exhibit 6, which is
20     the September 2017 version of the Oklahoma Driver's
21     Manual, and, I believe, Mr. Danaher, that's the one
22     you listed.  Does that sound correct to you?
23 A.  Yes.
24 Q.  And I believe you said chapter 9.  Flip to page
25     9-1.

```
 1              So I've got up on the screen here a stopping
 2       distance and braking chart, and I think this is --
 3       is this kind of the information you were just
 4       talking about?
 5   A.  Yes.
 6   Q.  And I think we -- didn't we determine the Ford was
 7       going about, give or take, 65, more or less?
 8   A.  Yes.
 9   Q.  So that would kind of put their data somewhere in
10       between the two of these columns?
11   A.  Yes.
12   Q.  Okay.  So that would be -- if he was 65, what's the
13       halfway point between the first two?
14              So about 143 feet for reaction distance; would
15       that be fair?
16   A.  Hold on a second here.
17   Q.  Yeah, check my math.
18   A.  I had to check my own math, so, yeah, 143 is that
19       what you said?  That's what I came up with.
20   Q.  Yeah.
21   A.  Yeah.
22   Q.  And on the second, I guess that's braking distance,
23       that would be a range of, looks like, one forty-one
24       five to two eighty-three five.  Is that what you
25       came up with?
```

```
 1   A.   Yeah, I guess -- so for the lower end it's 141,
 2        142.  Then for the higher end is 327.  Is that what
 3        you -- no, no, no.  Sorry.  Sorry.
 4            Was two eighty-three five.
 5   Q.   And on the total stopping distance, I got two
 6        eighty-four five to four twenty-six five on the
 7        average low and high end.
 8   A.   Yeah, that seems right.
 9   Q.   Okay.  So obviously that gives us a range, you
10        know, because there's all kinds of dynamics, you
11        know, to enter into this.
12            What kind of factors enter into the dynamics
13        whether someone is able to, you know, be at the top
14        of their range or the bottom of their range?
15   A.   Wow.  That's a big question.  I mean, from what's
16        going on with -- how they're determining these, I'm
17        not sure what methodology that they have to arrive
18        at these numbers.  Clearly, on something the math
19        is -- if there's math involved here, they're not
20        just guesswork.
21            But if you look at the numbers, right, so --
22        and this is what's interesting.  So if you look
23        at -- like, let's just take -- just to make it
24        easier, right, let's look at 60.  So they have a
25        braking distance of 120 and 240.  So if you go
```

```
 1        through the numbers here, right, and figure out
 2        what that means in terms of deceleration, which for
 3        me is, like -- is a good way to quantify what
 4        they're doing here.  Distance is helpful, I think,
 5        for a lot of people, but for me, I'm an engineer.
 6             So those numbers represent point five to,
 7        like, 1G and so they're actually very -- the point
 8        five in a situation is kind of light, you know, and
 9        1 is --
10   Q.   You're stepping on it.
11   A.   Well, it's more than stepping on it.  Most vehicles
12        can't even achieve that.
13             So they've been really -- they really had the
14        extremes here in terms of, you know, when a vehicle
15        is faced with this.  And I think that, you know --
16        their logic behind it I'm not sure, but -- you
17        know, that's why people kind of fall in the middle
18        of, like, point seven; right.  That's kind of where
19        people typically when emergency braking fall, but
20        for whatever reasons instead of using, like, what
21        the average is they give the extents, so that's
22        what makes it a little bit interesting.  Why
23        they -- why they did that I don't know, but they're
24        picking pretty high and low ends.
25   Q.   In working on your report, did you have to make any
```

1    whatnot.  After your first hour of testimony, sir,

2    do you have anything you need to revise, correct,

3    or further clarify in your testimony?

4  A. No.

5  Q. So I believe we were talking about, you know, some

6    of the things and -- you know, with where the

7    trucks are and reaction time.  In both my expert's

8    report and it was referenced in yours was this

9    gentleman by the name of, you know, Brad Muttart.

10   I assume Mr. Muttart is -- is he kind of like the

11   godfather of reaction times?

12 A. Yeah.  Muttart has claimed his nitch in life.  Up

13   until Muttart, there was -- everyone used 1.5

14   seconds of reaction time for daylight conditions

15   for everything and Muttart would have none of that,

16   so he's dedicated his life in reviewing and

17   researching naturalistic studies from your alma

18   mater as well, right, and from a few other

19   universities that look at reaction times of drivers

20   in a lot of situations, so he's, you know, become

21   kind of the predominant guy in the field right now,

22   one of just a few, that looks at driver's actions

23   relative to accidents.

24 Q. When we were talking about these reaction times and

25   everything in here and the percentiles of where

1    people fall in the reaction time, did that --

2    that's all based on some of Muttart's publications?

3  A.  Yes.  It's on Muttart's -- you know, it's all

4    Muttart, yeah.

5  Q.  Okay.  Because I was particularly interested in

6    this -- on page 16 of your report talking about,

7    you know, avoidance of the collision.  You talked

8    about the 85th percentile reaction time.  Kind of

9    walk me through this.

10 A.  So Muttart in part of his teachings, he created

11    files at the 1.5 reaction time.  So what he's done

12    is that he's come up with a way to look at

13    literally thousands of data sets in terms of actual

14    video as well as other reports and papers and

15    literature, just a compilation of so many things.

16    I've taken his course twice and the first time was

17    five days solid at Northwestern.  I was, like, "How

18    could this possibly take five days?"  It's very

19    intense.

20        So what he's doing is that your -- eventually

21    he's able to boil it down to something useful where

22    you are given a situation, right, and you can say,

23    "Look, given these factors," right, "is it

24    daylight?  Is it a cutoff?" You know, "what

25    parameters do you put in here as far as what your

1  Q.  Did you take into your calculations Mr. Waterdown

2      when, you know, he would have first perceived with

3      his preception-reaction time whether or not he

4      could tell whether or not the truck was taking

5      control of his far south lane or whether he was

6      performing this U-turn activity?

7  A.  I'm not sure if I entirely understand your

8      question.  Let me see if I can answer it.  So I'm

9      not trying to interpret what -- I'm not trying to

10     get into the mind of Mr. Waterdown; right.  Like,

11     I'm not trying to say, you know, this is when he

12     perceives the car to making -- you know, this is

13     when he understands it's going left or this is when

14     he understands he's in his lane or -- I'm not

15     trying to figure out what he's thinking, I guess.

16         What we're doing - and this goes back to

17     Muttart - is you have two things in perception-

18     reaction time.  You have the time itself, which

19     we've been talking about, right, the 2.2 and the

20     1.6, so that's an absolute time.  The time that

21     they've calculated, but it's a time.  The question

22     then is, well, when do you start that clock; right?

23     And I think that goes to your question, that's why

24     I'm trying to answer it this way, is, you know, do

25     you start that reaction when he's fully in the lane

1    in front of you or do you start that reaction when

2    he's across both lanes or -- you know, when does

3    that timer begin.

4        And so what Muttart has done to help alleviate

5    this, is that that's why it's the first lateral

6    movement that you apply that specific number to

7    that scenario.

8        So, let's say one study they did it where they

9    started the clock at, you know, across this certain

10   line, right, and then another study they did it

11   when it was referenced off of when somebody was --

12   you know, the steering angle of the car was

13   15 degrees, so there's different reference points.

14       So in this particular case, you're looking

15   at -- you take the first lateral movement and you

16   use this PRT.  If you were to change it to some

17   other position, like, if he's partially across the

18   road, right, well, then you change the PRT.

19  Q.  Okay.  That makes sense.

20  A.  Okay.  Sorry about that.  I just wanted to --

21  Q.  No, no, no, because, you know, you and I sitting

22   here Monday morning quarterbacking, it's impossible

23   to know what was in someone's mind.

24  A.  Right, so we're just trying to pick a common point

25   for the studies.

1    is -- you know, if it's happening during the day,

2    right, you take that into account.  So there's all

3    these different factors, right, including where the

4    vehicles are located relative to each other and

5    where the roadway -- if it's near an intersection,

6    right, or if it's just on an open road.

7         So it is accounting for all of those, so I

8    don't know how to say more or less, but it is

9    factoring in all those different pieces in arriving

10   at those times.

11  Q.  So how would it factor for, like, the hazard of a

12   vehicle moving into your lane of travel versus a

13   hazard of a vehicle obstructing the length of the

14   roadway?

15  A.  You're looking at it the same way; right?  It's

16   cutting you off.  It's taking up your travel lane.

17   Part of it's taking up your whole lane or only part

18   of your lane and, you know, going more lanes over

19   it's the same; right?  Your path of travel has been

20   blocked, and so that's what you're reacting to.

21  Q.  If we had started the reaction time, because I

22   think you kind of alluded to that, when the semi

23   crossed from the far south lane of travel into the

24   northern lane of travel going eastbound, did you

25   ever run those calculations?

```
1   A.   I mean, you could probably with some different
2        literature somewhere, but that's not -- I will tell
3        you this.  If you were to use that as the starting
4        point, then those reaction times changes; right?
5        It will no longer be 2.2 or 1.6, whatever, it will
6        be something much shorter than that.  But, you
7        know, there's no publication that I know of that
8        would do something like that.  Maybe there is,
9        but -- that's why we use a base system to try to
10       quantify all of these.
11  Q.   Well, because we're Monday morning quarterbacking
12       this here, I'm just trying to think that, you know,
13       when a vehicle reacts and changes lanes of travel
14       verses to an unexpected event occurring in front of
15       them, if their unexpected event continued to
16       evolve, would that ever reset the reaction time?
17  A.   I think I maybe understand what you're saying.
18       Yeah, I mean -- there's no -- I don't know how to
19       put it.  That's why they try -- because there's so
20       many situations that you can get into, right, that
21       they're trying to account for all of those things.
22       And I will tell you this much, right, but in
23       general during the day -- and pretty much all
24       accidents, that's why 1.5 has been so popular for
25       so long, is that even Muttart as much as he might
```

1    dislike that number, everything seems to fall

2    within that same area.  You're never going to

3    get -- 2.7, 2.8, 3 seconds, those numbers are

4    reserved for nighttime.  Like, that's nighttime

5    type of stuff.  Where you've got your visibility

6    and contrast are so diminished, you're unable to

7    distinguish things well enough to make any kind of

8    judgment.

9        So, you know, if you -- when you talk about

10   1.6 and 2.2, that is a real big extreme with what

11   people react to during the day.  And, again, any

12   given situation -- you can go and manipulate all

13   those numbers you want and it will only go down to

14   those numbers.  You know, 2.2 is really high.  But,

15   then again, it's really less about the reaction and

16   it's more about, you know, his actions, right, of

17   what he's doing.

18  Q.  Well, and that's why I'm trying to sit here Monday

19      morning quarterbacking today.  We're trying to

20      think if, like, the unexpected event is, you know,

21      is someone in your lane of travel, then, you know,

22      potentially a second unexpected event of someone

23      across all lanes of travel, that's what I was just

24      trying to see, if there were, like, any kind of

25      analysis that you'd go, "Ah, unexpected event,

1    people were reacting more to the car when it's at

2    15 degrees or maybe when it was more across the

3    lane; right?  That's what they're thinking when

4    they're reacting to it because that's what they're

5    seeing, but you can't -- even when you do the

6    tests, you can't read someone's mind as to when

7    that point actually takes place.  You know, when

8    does that occur it's happened.

9         So what they do is that they try to bring it

10   back to a baseline, and that baseline is when that

11   car first begins to turn.  And so -- and then they

12   look at the averages of people given all these

13   different circumstances, right, and see how -- what

14   is their time and how do they react to it.

15        So that's why it's -- you know, could it have

16   been happening if they said it was happening, you

17   know, that's probably true, but what I'm telling

18   you is that what Muttart is doing is they are

19   taking those into account, because they have to

20   somehow -- you know, they have to make a common

21   point so that you can keep the time and everything,

22   you know, consistent.

23 Q.  So based on your review of the data here on Figure

24   17 in the nonghosted image of the Ford, that's when

25   it looks like Waterdown started to do some kind of

```
 1        reaction with his vehicle; correct?
 2   A.   Yes.
 3   Q.   Can you tell us what his first thing he did was?
 4   A.   Well, sort of, was the beginning of the turn to the
 5        left.
 6   Q.   Okay.  So he began to move into the northern lane
 7        of travel?
 8   A.   Yes.
 9   Q.   Would that be an appropriate reaction for seeing
10        your lane of travel blocked?
11             MR. GOODNIGHT:  Object to form.
12   A.   I don't know if it's appropriate, but people do
13        that all the time.
14   Q.   (By Mr. Garrett)  Okay.  And it looks like, you
15        know, after traveling whatever distance that is
16        from there to there - let's call it 75 feet, you
17        know, whatever it is --
18   A.   It's 93.
19   Q.   Okay.  Sorry.
20             So after using 93 feet to move to the northern
21        lane of travel, that's when the braking action was
22        performed; is that correct?
23   A.   Correct.
24   Q.   And it looks like there was braking action and
25        continued swerving to the northern direction; is
```

1    lateral movement is the middle ghosted position;

2    all right?  So back -- yeah, so go back -- yeah,

3    that guy, that's when it starts to happen, and the

4    end of his reaction time is that, yes.  Exactly.

5        So at that point where it's solid in Figure

6    17, if you're going to apply those brakes even then

7    hard, right, and swerve, he would have avoided it.

8  Q.  So because he swerved and then applied his brakes

9    we get the incident that we have?

10 A.  Yes.

11 Q.  So when you testify and tell the jury about your

12    opinions in this accident, is it my -- am I

13    understanding your testimony that you believe that

14    had Mr. Waterdown reacted quicker or in different

15    ways the incident could have been avoided?  That's

16    probably a real horrible generalization.  Why don't

17    you give me your words rather than you taking mine.

18 A.  Had Mr. Waterdown either reacted sooner or braked

19    harder or a combination of both, he could have

20    avoided impacting the tractor-trailer.

21 Q.  Why was the tractor-trailer in this position?

22 A.  I don't know.  I guess he was trying to -- lost or

23    change -- I don't know.  He's obviously trying to

24    make a left.  I think he was lost or looking for

25    directions or something.

1    were just some of the discovery responses.

2         Just so I'm clear on some things.  You don't

3    have an opinion as to what, like, the rules of the

4    road or the Oklahoma traffic laws are; is that

5    correct?

6  A.  Right.  No.

7  Q.  The extent of your analysis were the physical,

8    studiable, tactile, touchable physics that occurred

9    within this accident; is that --

10 A.  It's the reconstruction of the physics of the

11   accident.

12 Q.  So I think we talked about, and you stated earlier,

13   you don't know what Mr. Waterdown was thinking or

14   doing; correct?

15 A.  No.

16 Q.  I mean, the only analysis we have is speeds, you

17   know, pictures and brake marks and things of that

18   nature; right?

19 A.  That's correct.

20 Q.  I believe you also stated that you're unfamiliar

21   with all the Oklahoma traffic laws, moving

22   violations, so you wouldn't have an opinion on any

23   of those; correct?

24 A.  No, I would not.

25 Q.  And I don't want to put words in your mouth, but

1                      C E R T I F I C A T E

2

3    STATE OF OKLAHOMA )
                       ) ss.
4    COUNTY OF TULSA   )

5

6           I, Kellie Erwin, a Certified Shorthand

7    Reporter in and for the State of Oklahoma, do hereby

8    certify that the above-named witness was by me first

9    duly sworn to tell the truth, the whole truth and

10   nothing but the truth in the case aforesaid; that said

11   deposition of DAVID DANAHER was taken by me in

12   stenograph on the 18th day of February, 2022, and

13   thereafter reduced to typewritten form under my

14   supervision; and that I am not an attorney for or

15   relative of any of the parties involved in this action,

16   or otherwise interested in the event of same.

17          WITNESS my hand at Tulsa, Oklahoma, this 14th

18   day of March, 2022.

19

20

21          _____
                Kellie Erwin, CSR, RMR
22

23

24

25

**NOT TO BE SOLD**



# OKLAHOMA
## DRIVER'S MANUAL

September 2017

PLANTIFF'S
EXHIBIT
**Ex 6**

 **Stopping and Following**

## STOPPING DISTANCES

There is no sure way to tell exactly how long it will take you to stop at a certain speed. Your stopping distance depends on:

- Your own reaction time.
- The weight of your vehicle.
- Weather and road conditions.
- The condition of your brakes.

There are three steps in stopping your vehicle—perception, reaction, and braking.

### PERCEPTION, REACTION, AND BRAKING TIME

| Step | Time | Explanation |
|------|------|-------------|
| Perception | About .5 seconds | See/hear danger |
| Reaction | About .66 seconds | Brain tells foot to brake |
| Braking/stopping | Depends on speed | Press brake until car stops |

Suppose you're driving on the turnpike at night, exceeding the speed limit at 80 mph. A deer suddenly appears in your headlights. Will you be able to stop in time?

It will take 1.16 seconds for you to see the deer and move your foot to the brake. *Before you even start to brake, you will have traveled 140 feet. If you're on a good road in good weather, the braking distance at 80 mph will be 320 feet.* Your total stopping distance is 460 feet, longer than one-and-a half football fields!

Can you stop in time? Probably not. Why not? Because at 80 mph, you are over-driving your headlights—you can't stop your car within the distance you can see.

The following chart shows you the estimated distance your car will travel under *ideal* conditions, from the time you see danger until you come to a stop.

### ESTIMATED EMERGENCY STOPPING DISTANCE

